[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action for dissolution of marriage and for other relief brought to the judicial district of Danbury. The plaintiff, whose maiden name was Faith Iznicki, and the defendant married at Irvington, New York on August 20, 1967. The plaintiff has resided continuously in the state of Connecticut for at least twelve months next proceeding the date of the filing of the complaint. There are no minor children issue of this marriage and the plaintiff is not currently pregnant. The parties do have two adult children, ages 32 and 33.
The court finds that the marriage between the parties has broken down irretrievably without any reasonable prospects of reconciliation. The court further finds that the cause of the breakdown is the defendant's infidelity and deceit, the details of which will be set forth below.
The plaintiff is 58 years old, born October 18, 1944. She testifies to be in good health, although she is treating with a doctor for depression and is currently on anti-anxiety medication. The first time the plaintiff ever treated with a doctor for depression was approximately two years ago at or about the time her marriage began to unravel.
The plaintiff and defendant met in Manhattan while both were working at The Kirby Block Corporation. The parties dated for approximately six months before they got married. At the time of the marriage, the defendant moved into the plaintiff's apartment in Yonkers. The parties continued to reside there until their first child, Mark, was born. The plaintiff left full-time employment after the birth of their first child, although she did some freelance fashion illustration on a very limited basis. After the birth of their second child, Diedra, the plaintiff completely left the work force. When the children were in high school, the plaintiff returned to work briefly, but found the responsibilities of the job, the children, the home and taking care of the defendant to be too much, and thus went back to being a full-time housewife. CT Page 3207
The defendant is 64 years old, born on April 26, 1938 in Germany. He completed two and one-half years of community college, with a focus on accounting, management and commercial writing. He has no post-high school degree. The defendant has lived in the United States since 1965, but is not a citizen. He testifies to be in "okay" health.
The defendant was first employed for a short period of time by the DuPont Corporation in 1965. Thereafter, he worked for Borden, Inc. from 1967 to 1977. At the time of his departure from Borden, he was general manager of adhesive tape exports. While employed at Borden, the defendant traveled approximately four to five months out of the year. From 1977-90, the defendant was employed by Elof-Hansson, Inc. He was first hired as a vice-president, but at the time of his departure he was president of the adhesive tape division. Again, this employment required the defendant to travel four to five months out of the year.
In 1987, the defendant started his own business along with his partner, Fred Macaluso, called Adhesive Tapes International, Inc. (hereinafter referred to as "ATI"), a New York corporation. The defendant, president of the corporation, and Mr. Macaluso, vice president of the corporation, each own 50 percent of the company. ATI is an international sales entity for various manufacturers of adhesive tapes. ATI's revenues are exclusively generated by exporting. ATI's clients are located in Europe, Asia, Indochina and South America. Again, this position requires extensive international traveling totaling four to five months per year, at one to three week intervals.[1]
Charles E. Coyne, ASA, testified for the plaintiff as to the value of the defendant's interest in ATI. Mr. Coyne has a masters in business administration from the University of Hartford. He is a principal in the firm of Valuation Strategies, LLC. He is certified as an accredited senior appraiser of the American Society of Appraisers in the business valuation discipline. He is a member of many professional organizations, has testified as an expert witness in state and federal court, and has instructed on his discipline.
Mr. Coyne opined that the defendant's 50 percent interest in ATI, on a non-marketable, non-controlling interest basis is $555,000. The defendant disputed this valuation. It was the defendant's opinion that his interest in ATI is $400,000, or otherwise, the amount of his personal loan to the corporation.
The court finds Mr. Coyne's testimony and evaluation report (Plaintiff's Exhibit 67) comprehensive and persuasive. The court finds the defendant's interest in ATI to be worth $555,000. CT Page 3208
The parties purchased their first home in White Plains, New York in 1972 for $37,000. The structure needed total renovation. The plaintiff literally did all of the interior and exterior renovations herself. The parties sold the property in 1994 for $370,000.
In 1985, the parties purchased property at 256 Great Plain Road in Danbury, Connecticut. The parties paid $135,000 for the property. It needed renovations as well, all of which the plaintiff again performed herself. The defendant wanted this property for rental purposes, and the plaintiff and defendant never used the property personally. For a short period of time, the property was used for the defendant's business, ATI. The property, still owned by the parties, is currently being rented, although the testimony of the parties indicated that the defendant recently told the tenants that they would soon have to vacate the property. The parties' opinion as to the fair market value of this property does not vary greatly.
In spite of the plaintiff's reluctance, in 1992, the parties purchased the marital residence located at 79 Lake Drive North, New Fairfield, Connecticut for $450,000. The parties put down $100,000 and carried a $350,000 mortgage. The parties used the proceeds from the sale of the White Plains property to pay off the mortgage in 1994. The parties have been mortgage free ever since.
The New Fairfield property was also in need of extensive renovations. Again, the plaintiff essentially did most of the renovations herself. Plaintiff's Exhibits 91 and 92, which are before and after pictures of the properties purchased by the parties, demonstrate plaintiff's renovations to be nothing less than astonishing.
The parties vary greatly on the fair market value of this property. The plaintiff estimates the property to be worth $700,000. The defendant estimates the property to be worth $1,200,000. The court did not have the benefit of a certified appraisal. The subject property is a one level ranch on a lake in New Fairfield. It has two-three small bedrooms, three full bathrooms, living room, family room and kitchen. There is a guest cottage which is used for storage. The dwelling is approximately 2,600 square feet. Photographs were provided to the court. The court finds the plaintiff's estimate of the value of this property to be more reasonable than the defendant's.
The plaintiff testified that before the summer of 2000, she and the defendant had a generally good marriage. They always celebrated birthdays, anniversaries and special holidays together. They had a hobby CT Page 3209 of going to tag sales together. The plaintiff felt as if she and the defendant were good friends. They enjoyed each other's company. The plaintiff believed that the defendant loved her and she loved him. The defendant testified that the plaintiff was "definitely a good wife and a good mother."
In the plaintiff's eyes, the parties' marriage was essentially uneventful until approximately the summer of 2000. This is the first occasion that the plaintiff began to notice irregularities in the defendant's behavior.[2] She would call the defendant at the office and he wouldn't be there. Additionally, the defendant was not coming home on weekends until very late at night. The plaintiff would stop at the defendant's office at 5 p.m. and he wouldn't be there. The plaintiff received several phone calls at the marital residence and the person on the other end would just hang up.
On at least one occasion, the plaintiff visited the defendant's place of work toward the end of the day. The defendant indicated he was going to work until 8 p.m. The plaintiff indicated that she was not going to leave. The phone rang and the defendant would not answer it. The plaintiff insisted on the defendant answering, at which time the defendant picked up the phone and simply said, "You have the wrong number." Through the receiver, the plaintiff could hear a woman's voice in the background.
The plaintiff was concerned about the defendant's behavior and thought that maybe he was "losing his mind." She asked him if he was okay, and he said, yes. At about this same time, the plaintiff found curious mailings around the house. In particular, she found a letter from the defendant to their accountant directing that the 1999 tax return be delivered to his office address, "not to my home." (Plaintiff's Exhibit 84.) Additionally, the plaintiff found various bank statements, typically sent to the marital residence, which had been redirected to a post office box. (Plaintiff's Exhibit 83.) The plaintiff felt confused, depressed and alone.
In early 2001, the plaintiff engaged the services of a private detective. The detective's findings are set forth in Plaintiff's Exhibits 74 and 75. The evidence clearly demonstrates that the defendant was in the company of another woman for odd and extended hours. The defendant and this unidentified woman freely came and went from property located at 35 Topstone Drive, Danbury, Connecticut. The detective's observations included the defendant letting himself into this dwelling; the defendant mowing the lawn; and the lights in the house being turned off at night with the defendant still present inside. CT Page 3210
The evidence further demonstrated that not only was the defendant involved in some rather questionable financial transactions, but also secreted away hundreds of thousands of dollars in Europe, all unbeknownst to the plaintiff.
The defendant testified about a Mr. Thio Touw Peng. The defendant met Mr. Peng through another businessman in approximately 1992 to 1993. All were involved in the adhesive tape manufacturing business. In 1994, the defendant met Mr. Peng in the United States at which time Mr. Peng gave the defendant the sum of $150,000 in cash, all in one hundred dollar bills. The defendant explained that Mr. Peng gave this money to him because Mr. Peng was unable to open an account in the United States in his own name. The defendant testified that he kept this money in his desk drawer at the marital residence. Over the years, each time the defendant met Mr. Peng, typically in Jakarta, Mr. Peng would give to the defendant an additional $10,000 in cash. By 1999, the defendant had received a total of $250,000 in cash from Mr. Peng. There was no promissory note or other document that would evidence this debt. Further, the defendant never disclosed this debt on any one of his financial affidavits filed during the course of this litigation. The first time this debt ever appeared on the defendant's financial affidavit was at the time of trial. The defendant testified that he still owes Mr. Peng approximately $80,000.
As the case neared for trial, the plaintiff, while going through documents at the marital residence, found several various foreign bank account statements, all in the defendant's name. These previously undisclosed foreign bank accounts were brought to the defendant's attention on December 20, 2002 by way of a request to admit. (Plaintiff's Exhibit 175.) The defendant never responded to the request to admit. At trial, the defendant testified to the existence of these various accounts, as well as, their current balances in francs, Euro-dollars and U.S. dollars. Never once during the course of this litigation did the defendant disclose the existence of these foreign accounts. The court would further note that not only were these accounts not disclosed on a financial affidavit, but in response to a request for production at three different depositions of the defendant, the defendant never produced these documents. The defendant's explanation as to why these accounts weren't disclosed was that they were "so vague I didn't consider it an asset." These "vague" accounts, by the defendant's own testimony, exceed $250,000.[3] The defendant further testified that it is his understanding that all these accounts are held "in trust" for him and the money will not be available until the defendant reaches the age of 75. The defendant failed to identify any trust officer or trust document to CT Page 3211 substantiate his claim.
The testimony further proved that on several occasions over the course of several years during the mid to late nineties into the year 2000, the defendant was regularly taking money from the parties' joint accounts and transferring it into an account in his name only. Thereafter, the funds would be transferred into an investment account in the defendant's name only. The plaintiff was completely unaware of these transactions. Several hundreds of thousands of dollars were transferred in this fashion. Plaintiff's Exhibit 187 indicates that in the year 2001, the defendant transferred $343,153.54 from the parties' joint Fidelity account. The balance on the account as of December 31, 2001 was $124.87. At various times, the endorsements on the checks withdrawing money from the joint accounts had the plaintiff's forged signature.
In the early 1990s, the defendant's mother passed away. She was a resident of Germany. The defendant, in conjunction with his sister, attended to the probate proceedings. The defendant inherited approximately $100,000 but offered no testimony as to the status of this money. The defendant couldn't testify as to what he did with the money or where it currently was being held, although he did indicate that "probably most of the funds are still in Europe."
The night before the first day of the defendant's deposition, the defendant confessed to the plaintiff that he had fathered a child fifteen years prior with a woman by the name of Janet Rodriguez. The defendant met Ms. Rodriguez on a business trip to Venezuela. The child currently lives in Florida with his mother and stepfather. While the child was still living in Venezuela, the defendant would visit on occasion, and sent to his mother approximately $100 per month and $600 two times per year. After the child moved to Florida, approximately four years ago, the defendant began to pay to the mother $1,000 per month. In the year 2000, the boy, along with his mother and stepfather, came to Connecticut to visit with the defendant. The defendant paid for their stay.
Again, unbeknownst to the plaintiff, the defendant was in the market to purchase a piece of real estate in the spring of 2000. The defendant testified that he was looking to buy a house for the benefit of Mr. Thio Touw Peng. As the story goes, apparently Mr. Peng's cousin, Upik Heriati, was in the United States and wanted to purchase a piece of property. The defendant executed a sales agreement for property located on Aqua Vista Drive in Danbury, Connecticut. (Plaintiff's Exhibit 81.) The sales price was approximately $130,000-$140,000. The defendant put down a deposit of $1,000-$1,500. Attorney Tony DiPerrio represented the defendant in regard to this transaction. For this transaction, the CT Page 3212 defendant used the name "Peter Wolf."[4] The sale was never consummated because, apparently, Mr. Heriati did not like the property.
The defendant's curious involvement with the local real estate market did not stop there. On November 16, 2000, Mr. Upik Heriati purchased property at 35 Topstone Drive, Danbury, Connecticut for $135,000. The evidence clearly suggests that despite the fact the defendant's name does not appear on the deed to this property, he was intimately involved in the acquisition of this property. Attorney Anthony DiPerrio testified that he represented the defendant in the purchase of property located at 35 Topstone Drive, Danbury, Connecticut, and that he and the defendant have an attorney/client relationship in regard to this transaction. Plaintiff's Exhibit 104 demonstrates that on November 9, 2000, the defendant withdrew from his Union Savings Bank account the sum of $13,500, made payable to "Hunt, Leibert, Chester Jacobsen TTEE." On November 14, 2000, from this same account, the defendant withdrew $121,500, made payable to Anthony DiPerrio. These two sums make up the purchase price of the property located at 35 Topstone Drive, Danbury, Connecticut. On the subject warranty deed (Plaintiff's Exhibit 94) the defendant's business address is listed and crossed out as the return address. The defendant testified that the money he used to purchase the property was Mr. Peng's and used for the benefit of Mr. Peng's cousin, Mr. Heriati. A search of public records by Gilbert Whitlock, private investigator, turned up no information on Upik Heriati. 35 Topstone Drive, Danbury, Connecticut was sold on July 31, 2002 for $210,000. (Plaintiff's Exhibit 95.) The defendant testified that he did not share in the profit of this sale.
The court finds the defendant's explanation for these events, at best, questionable, at worst, complete fabrications. Furthermore, when the defendant's explanation of events is set against the backdrop of infidelity, the undisputed concealment of large sums of money abroad and the sport of transferring large sums of marital dollars into accounts under defendant's name alone, the court has considerable doubts as to the defendant's ability to testify truthfully.
The evidence taken as a whole though clearly demonstrates that the plaintiff has served the defendant and family selflessly, and the defendant has served himself.
The court dissolves the marriage of the parties, and declares each to be separate, single and unmarried. Further, the court enters the following orders.
 ORDERS CT Page 3213
BY WAY OF REAL PROPERTY:
1. The defendant shall transfer by quitclaim deed to the plaintiff all his right, title and interest in and to the real property located at 79 Lake Drive North, New Fairfield, Connecticut within seven (7) days of this decision.
2. The plaintiff shall transfer by quitclaim deed to the defendant all her right, title and interest in and to the real property located at 256 Great Plain Road, Danbury, Connecticut, upon plaintiff's receipt of the quitclaim deed referenced above.
BY WAY OF BUSINESS HOLDINGS:
1. The defendant's 50 percent interest in Adhesive Tapes International, Inc. is awarded to the defendant free and clear of any claim made by the plaintiff.
2. The defendant's 50 percent interest in Comeng's Inc. is awarded to the defendant free and clear of any claim made by the plaintiff.
BY WAY OF BANK AND INVESTMENT ACCOUNTS:
1. The following accounts are awarded to the plaintiff free and clear of any claim made by the defendant. Said accounts are to be transferred to the plaintiff within seven (7) days of this decision.
(a) Ridgefield Bank savings
(b) Ridgefield Bank checking
(c) Fleet Bank trustee checking
(d) Union Savings Bank savings
(e) Salomon Smith Barney (joint account)
(f) Salomon Smith Barney (defendant's account)
(g) Fidelity Investments
(h) CIBC Oppenheimer
(i) Dreyfus CT. Bond Fund CT Page 3214
(j) Kaufman Fund, Inc.
(k) Merrill Lynch
(l) New England Security (Putnam)
(m) Raymond James Financial
(n) Boulder Brewing Company stock
(o) Goldome stock
(p) Apache Energy Mineral Company stock
(q) Silver State Mining Corporation stock
(r) New Star Corporation stock
(s) Energy Oil Incorporated stock
(t) Rocky Mountain Minerals, Inc. stock
(u) Defendant's Discover Financial Money Market
(v) Defendant's Union Savings account
2. The following accounts are awarded to the defendant free and clear of any claim by the plaintiff and are to be transferred to the defendant within seven (7) days of this judgment:
(a) Defendant's Savings Bank of Danbury
(b) Adig Investments
(c) Commerzbank
(d) Noris Verbraucherbank GMBH
(e) Deutsche Bank accounts
(f) NorisBank accounts
(g) Banque Indosuez CT Page 3215
(h) Hanseatic Bank
(i) USB account
(j) Postbank
(k) Alte Leipziger bond
BY WAY OF DEFERRED COMPENSATION PLANS:
1. The following assets shall be divided equally between the parties:
(l) Chase Manhattan Bank IRA (plaintiff's)
(m) Dreyfus
(n) Fidelity IRA (plaintiff's)
(o) New England Security Fund
(p) Dreyfus/Transamerica
(q) Fidelity IRA (defendant's)
(r) Chase IRA (defendant's)
(s) Elof Hansson Defined Benefit Plan
(t) Borden Defined Benefit Plan
2. Both parties shall fully cooperate to effectuate the division of these accounts, including the preparation of any domestic relations order that is necessary in order to effectuate the transfers.
3. The parties shall share equally in any and all costs associated with the preparation and placement of the necessary qualified domestic relations orders. The court appoints Mr. Barry Kaplan to prepare the subject QDROs. Each party shall initially tender to Mr. Kaplan the sum of $250 to commence his investigation of the plans.
BY WAY OF ALIMONY:
1. Based upon the defendant's gross earnings of $144,000 per year, the defendant shall pay to the plaintiff the sum of $6,000 per month until the plaintiff dies or the defendant dies. Said amount is due and payable CT Page 3216 on the first of each month.
2. The defendant shall cause the ownership of his life insurance policies to be transferred to the plaintiff and the plaintiff may thereafter choose to maintain the policies.
BY WAY OF DEBTS:
1. The defendant shall assume all debts listed on both parties' financial affidavits submitted at the time of dissolution.
BY WAY OF MEDICAL INSURANCE:
1. The defendant is to provide the plaintiff with an adequate policy of medical insurance, substantially similar to the policy currently in effect for the benefit of the plaintiff. The defendant's obligation to provide this insurance shall cease when the plaintiff reaches the age of 65.
2. The defendant shall be responsible for his own medical insurance needs.
BY WAY OF TAX REFUND:
1. The plaintiff shall be exclusively entitled to the 2001 state and federal tax refunds.
BY WAY OF PERSONAL PROPERTY:
1. The defendant shall be exclusively entitled to all those items set forth on Exhibit 90. All remaining marital personal property shall be the plaintiff's exclusively.
2. The defendant shall be exclusively entitled to the 1987 Bayliner free and clear of any claim made by the plaintiff.
3. The plaintiff shall retain and be responsible for the 2002 Subaru Outback and the defendant shall retain and be responsible for the 1992 Subaru Legacy.
BY WAY OF ATTORNEYS FEES:
1. The defendant shall contribute the sum of $10,000 towards the plaintiff's counsel fees within seven (7) days of this decision. CT Page 3217
MISCELLANEOUS PROVISIONS:
1. The defendant shall be responsible for and pay to Union Savings Bank any charge incurred and still owed for copying of various records for purposes of this litigation.
2. The defendant's motion for modification dated August 12, 2002 is denied.
3. The defendant's motion for contempt dated August 12, 2002 is denied.
4. The plaintiff's motion for contempt dated January 17, 2003 is granted, and the defendant is herein ordered to pay to the plaintiff all sums she has paid for the household while this matter has been pending, which would include, but not be limited, to Plaintiff's Exhibits 99, 100 and 101. Said payment is to be made within five (5) days of the defendant's receipt from plaintiff of proof as to the amount owed.
5. The defendant shall cause to be transferred one-half of the frequent flyer miles accumulated to the plaintiff, which would include any award type programs for use of credit card.
6. One-half of the tax loss carried over from the sale of stock by the defendant shall be credited to the plaintiff as a carryover loss for her income tax returns going forward.
Bozzuto, J.